respectively. Oral argument has to exceed 10 minutes or each defendant, 30 minutes to explain it. Mr. Chairman, shall we begin? Okay. My question was going to be, I have on my list here in the order of Teadt, Emmenecker, and Heubner. Is that correct? Your Honor, Mr. Heubner is going to go second. Okay. That's why I asked. All right. You may proceed. Thank you, Your Honors. May it please the Court, here this morning representing Mr. Michael Teadt, who I have the pleasure of having in the courtroom with me this morning. I've raised several issues in my brief, and I'd really like to focus on one, that being the sufficiency of the evidence on the mail fraud count. If I have time, I would like to turn to the forfeiture issue, but those are the two issues I'd like to address to the Court's attention today. As to the mail fraud count, Mr. Teadt is not guilty of that offense because he never knowingly joined a scheme to defraud Wood County. This involves a little bit of parsing of the evidence in this case, and I think that's why the jury lost its way in this case. Essentially, it's one thing, it's a sufficiency of the evidence. Yes, Your Honor. Did you raise this issue at the close of all the evidence? Your Honor, the Rule 29 was argued at the close of the governance evidence, but it was not renewed at the close of all evidence, and there was no post-trial motion filed on behalf of Mr. Teadt. Then, what standard do we use to review your argument? Unfortunately, we are left with the manifest injustice standard, so that means that in order for Mr. Teadt to prevail this morning, you have to find that the evidence is utterly devoid of at least one element of the conviction in this case. Which element do you say there's no evidence? That is the joining of the scheme to defraud Wood County, because that is the only scheme that we're talking about here, is that Wood County is out $5,569 as a result of Mr. Huebner's scheme to defraud him of that. Nothing to do with Dinners? Nothing. I'm sorry, Your Honor. Dinar. No, no. Actually, my client was acquitted of all the Dinar allegations, so the only thing we're talking about here is a job program that was in Wood County that actually reimbursed the BEH group 50% of funds that were expended on salary for training, and that's what we're talking about here this morning. The only question for this court is, is there evidence in the record to support that my client knowingly joined the plan to defraud Wood County? We would suggest that there's absolutely no evidence to support that. But didn't Mr. Teat admit under oath that he wrote down all of the false information on the form, and the form that will be submitted to Wood County so that Huebner could receive the benefits, and is that sufficient to constitute a joining? I think this is why I said that the evidence needs to be parsed out and why the jury lost its way, because that is correct. Mr. Teat actually testified at this trial and testified that he provided false information on the form. It wasn't a form that was mailed, but he actually went to Wood County and at their offices put false information on that form. So if a jury listening to that evidence might therefore make the leap of logic to say he then joined the scheme to defraud Wood County, but that's not what the evidence shows. What the evidence shows is that yes, he put down false information on that form, and the false information was essentially that he was unemployed at the time that he filled out the information. He was not unemployed. His testimony at trial was that he was leaving that, I think the form was filled out on July 30th, 2010, and he was leaving from there to go back to New Jersey. The question is pretty clear about this, which was he expected to lose his job, so he was going to be unemployed. He therefore was going to start working with the BH group, get trained, actually benefit from the training, and he thought that everything was going to be on the up and up there. He gets to New Jersey, and they don't terminate him from his employment. So then the questions become, well, why didn't you fix the information that was on the form or things like that? The problem here is that at that point, it's almost like a condition precedent in a contracts case. In other words, if I lose my job, then I will start working for BH group, and I will start getting a salary from BH group. I never lost my job, therefore as far as I know, Mr. Teed, this is over with, and in fact, he didn't receive a salary from BH group, and then a salary, and then did the training. But the information was false when he put it down, right? Absolutely. While his explanation may be a good one, the jury's entitled to disbelieve that as the explanation for what he did when in fact it was false. They can disbelieve his explanation, but there still needs to be some other evidence in the record presented by the government that he joined the scheme to defraud. And that's where it breaks down here, because there's an absence of evidence that shows that he actually joined the scheme to defraud. He was sent there by Huebner, right? Absolutely. Again, that's the circumstantial evidence of it being, not he just went down willy-nilly and said he was going to work for BH group. He was sent by Huebner. Exactly. But the scheme to defraud by Huebner couldn't have existed at least to the extent that Mr. Teed could join it until he knew that he wasn't that he wasn't going to lose his job with SS White, and then the scheme could exist, it just wouldn't have come to fruition until, I mean, it wouldn't have been a scheme to defraud. That's my point. It turned out that way. Correct. If he had lost his job at SS White, it wouldn't have been a scheme to defraud at that point. It would have become like the Queen Anne's Lace, right? They had a scheme to defraud, but then it would have turned out to be okay. Exactly. And so that's the problem with this case in terms of this count of conviction. And I cited to the Frost case in my brief as the main case I'm relying on, because in the Frost case, as this court will recall, it's a very intricate analysis of all these moving parts of a mail fraud case of, well, we're getting these dissertations that are paid for and used, and then we're also getting these government contracts. And the problem that the court said in Frost is that we can't connect the fraud. We know there's fraud because we know there's false information and there's these false dissertations that are going on. We know that. We know there's fraud. But we can't tie it into the scheme that ultimately occurred in this case. And that's the problem with this case, is that connection between the fraud which is admitted and the actual scheme to defraud Wood County of which Mr. Teat had no part of. I have 45 seconds left, and if there are any questions, let me just say for very, very briefly with regards to the forfeiture issue. On the forfeiture issue, that's a part of the criminal indictment in this case that was never dismissed by the government. The grand jury found probable cause that Mr. Teat owned this money, this $15,000, and he testified to that effect both before he was ever indicted, before he thought he was under investigation, and then afterwards at the trial under oath. The DNAR is in the desk. The $15,000 that were in his desk that everyone says that was his own desk, not part of BH Group, and was locked at the time that the investigation, or at the search warrant was found. Thank you. Good morning, your honors. I am David Doughton on behalf of the appellant Bradley Huebner. I would like to reserve two minutes for rebuttal. Your honors, I had intended originally to argue the sufficiency issues, but I have to concede up front that the government is right that the Rule 29 was not issued, and rather than argue the manifest injustice, I think I would spend my time on an interesting issue, which is in fact the restitution issue, because it's unique and I don't think there's established precedent on this issue. In this case, the judge determined the restitution by going through the number of people who had bought the DNARs. Then he determined basically the fair market value. He had found two different commercial pricings for it, and averaged it, in all fairness, low-averaged it, and determined the ratio and came out with the amount on that. The problem with this is this. The uniqueness of this case is many of the victims really didn't feel they were victims. We have at least fourteen who testified, and it's unclear. They were identified, excuse me, the victims from Mr. Huebner. What wasn't asked is how many people had actually sold theirs, or whether they were going to consider that they had lost it, or whether they would have invested it anyway. You're saying that if they don't self-identify as a victim and say, I've been defrauded, then the court can't include those in the loss calculation? No, this is restitution. There can be a fraud in the restitution. Yes, and let me explain why. Because we have a situation where a number of witnesses would say, for instance, I looked into this independently. I saw Jim Kramer see something. I had gone onto the internet, and I saw their sites all over the place, and I was aware, for instance, that Utah said this was the biggest fraud that was going on. But I still decided, you know, I'm not doing the family nest egg, and I would like to do this. When approached by the government, you know, they said, you know what, I'm going to hang on to this. This isn't that much, and I think maybe it's not going to be the revaluation where we're going to get a billion dollars. But in fact, I may get something. Even if it goes up to fifty cents, I may get something. So we have a situation in which Mr. Huebner is paying for their loss, but they haven't cashed in their dinar. I understand your argument, and I just want to know for this novel issue that you are identifying, has any court addressed this particular point that you can rest your argument on? Is there a case? Not particularly, but what I can do is point to, in the Roberts case cited by the prosecutor in their brief, where the Supreme Court did their valuation, and in its, and they basically determined, you know, how you do an offset. In it, Justice Sotomayor indicated that, look, this may be different if the victims hadn't claimed the loss, if they'd have hung on to the property. And I guess, and I'd like to kind of stress that argument, what if we had a situation where there's a house, Roberts involved housing and fraud with housing. You buy a building, you were defrauded. You're told by the prosecutor, look, you were defrauded, it's not worth at all what you think. The piping's bad, the roof is bad, and you were lied to in the report. And the person says, you know, I kind of was aware of that, but I'm going to hold on to this anyway, because this neighborhood's coming back, and I think that it's going to grow down and the value's going to go up, so I don't want to sell it. I want to keep it. I want to hold on to it. We have a situation where if you pay the restitution, does that money go to the owner who still possesses it? So he's paid, because I assume that's where restitution money goes, so he accepts the money, and yet then the building goes on, and it is worth something. It's worth far more than he paid for it. Is he double-paying? But isn't the future, the future's unknown, what the restitution calculation does if you compute a market price? That's today, and the rest of it is at his risk, because to take your example, I buy a house for $500,000, turns out, whatever reason, it's bad, and it's only worth $300,000. I've got a market appraisal that it's $300,000, and in effect the government says, you know, you want to sell it for $300,000, or do you want to keep it, but we know it's $300,000, and you're, say, in Kentucky, you're betting on the come, you hope it'll go up, but you were still defrauded there, weren't you? To put it at the worst, the true market price is $300,000, and my cousin buys it, and I buy it right back from him at $300,000. Then clearly you'd have the $200,000 loss, wouldn't you? I understand, and I guess, can you be defrauded? Absolutely. So we're not talking whether he's guilty of the offense, so he's defrauded. But when the victim, if you will, decides, you know, he has a choice. I can sell and take my loss, or I can hang on. It's the individual, and if the victim says, you know what, I really don't think I'm out anything, and in this case... That's different. It's not saying I'm not out anything. It says that given, because if I do sell it, I'm only going to get today's market price. So it's simply the same thing as being willing to buy it at today's market price. That's why I said, suppose I sell it to my cousin, I take my loss legitimately. But I say, hey cuz, I'd like it back, and he sells it right back to me. Well, maybe that's where we have to draw the line, because we have a situation here where these people weren't somewhere, because there's a civil suit, so I'm not saying everyone. It's just not identified in the record. But we have a situation here where the person is saying, you know, look, I was aware of the problems with the dinar. You know, they didn't go into this blindly. You know, I researched this. I determined that I could afford... This is a high-risk situation, and so I decided I wanted to take this, fully aware of what was going on. Plus, in this case, in fact, in many cases, Mr. Huebner and the BH group did say, look, there's no guarantee. You know, they weren't saying this is a guaranteed return, and it may be high-risk. Absolutely, they sold it with Rudy's False. I'm not arguing that point. But this was not a case where the persons weren't... You know, in other words, in a housing situation, you can get an evaluation, this is what it's worth. In this situation, every investor was, in fact, aware that this was not a guaranteed thing. And most of them testified. Some said, on the record... Those don't sound like arguments that there's no fraud, not that there's no loss. In other words, if you make a bad investment knowing that it may be a bad investment, then there may be no fraud. But if somebody lies to you, you said you've got the fraud, didn't you? Yeah, I would answer the answer, but there are two different things is what we're parsing out. One is, if I'm defrauding you, and I know you're defrauding me, I'm still defrauding you. My scienter is still defraud. So I'm not arguing that there can't be a fraud here. But if I'm aware of it, and I make a determination after I'm given the opportunity to sell, and I decide, nope, I want to keep this, and you tell them, look, you're not going to get your restitution back if you don't, that's fine, because some of the people in the room said, I'm going to buy more. Even knowing everything, there are people on the record who said they were going to buy more. I see I'm into my time. Suppose you were, Freddie Smith came up and said, how would you like to invest in my oil well? And you, being a sophisticated guy, said, okay, I'll do that. Knowing, probably, like all oil wells, it's going to go belly up, right? So when it comes time, like all oil wells do, it goes belly up, and the governments are there nipping at your posterior, and the person comes in and says, Mr. Smith bought, sold you this thing, do you want to get your money back from Mr. Smith? And you go, no, I think my question's clear, no, I'm going to write it off on my taxes. If I get it back, then I can't write it off on my taxes. And that's going to cause me a whole world of grief. So people who are sophisticated investors, they'll like to take losses. Well, I think the argument would be that there would be an offset. The value that you were able to, if I have time to answer, that there would be an offset, that what you were able to deduct in your taxes should be offset from your license. And the other problem with that is the oil well, you know finitely it's done, it's not going to work. With the dinar, you don't know that. And that's, therein lies the difference. Thank you very much. Good morning, your honors. My name is Matt Gilmartin. I represent Charles Emenecker. I am taking five for my argument and reserving five for my rebuttal. Mr. Emenecker is what I would describe as a true believer. He was involved in a multi-market marketing scheme selling Zango vitamin juice. He was very successful at it. He, at the start, I think in 2010, he made over $300,000 and his revenues dropped to $86,000. Being an enthusiastic person, he met Mr. Eubner, heard about the dinar, and thought that, from what he had heard, this was a great opportunity for him and his friends. What's interesting about this case is currency is expressly exempt from the securities laws. So when they were selling dinars, they didn't break any law. All they had to do was register with the Treasury and make reports to the IRS about their sales. And they complied with that. And as a matter of fact, all of the dinars they sold were delivered and received by the people that got them. And the people received them at about the proximate market rate. And there is a great spread between the bid and the ask. Just like if I buy a car and I drive it off the lot, it immediately loses 25% of its values. When problems started is when Mr. Conin or Cronin, I forget his name, and Mr. Eubner decided to start a hedge fund and sell, I believe, pre-seeds or whatever the term they use. No ifs, ands, or buts, that was an investment. But Mr. Emenecker, even though he spoke positively about it, never got any money from selling dinars, never got money from the sale of these seeds. And in fact, he put in about $20,000 of his own money, which he lost. And so the principal question is, let me pose this hypothetical to you. What if Mr. Emenecker was a news reporter, and instead of talking on the website, he interviewed Mr. Eubner and Cronin and wrote an article? Well, let's say he interviewed Bernie Madoff and everything went south. He had a First Amendment right to say all these things. There's no question there would be no prosecution for any of this. The defense is really stretching, I'm seeing the prosecutor, is really stretching it to say, well, he wanted to get more money for his Zango clients. Well, newspapers want to raise their sales and their subscription. So if we transfer these facts over to a newspaper or a TV show, they would be guilty of trying to defraud the government. So there really was no underlying basis for violating the law. And during the entire trial, the prosecutor continually referred to dinar sales as an investment. Now, of course it's true, people decided to throw the dice, take a flyer, because they wanted appreciation for the dinar. But since it's expressly exempt from the security laws, no law was broken, no matter what they said, as long as they got what they received. You're saying they can't be fraud in the sale of currencies? If the representations are fraudulent, then how is that different from fraud in the sale of a piece of China or a Ming vase or a phony Rembrandt? Well, not a phony Rembrandt. Excellent question, Your Honor. Is a picture a security? No. I mean, why is saying something's not a security? Because the law says. I didn't mean to interrupt you. I'm sorry. I'm just saying, are you saying that to commit wire fraud, you have to be committing securities fraud? No. That sounded like what you, otherwise, why is it relative? The government mischaracterized what happened. This was not a regulated sale. You have people selling gold, saying the world's going to end, the currency was supposed to collapse last October when China became part of the, you've got it. As long as they got what they paid for, there's no criminal fraud. All these people got their dinars for what they paid for them. Nobody didn't, and the dinars were not counterfeit. I only have 10 seconds left. I like to stand on my brief, but on the Rule 29, Rule 29, if you look at the, in our brief, the Calderon and Wagner case, the waiver of the directed verdict motion comes if the defendant puts on extra evidence and cross-examines witnesses after the judge decides. The judge ruled after Mr. Emanetker put on his defense, then they didn't put on any more evidence, and they didn't question any more witnesses. Therefore, they didn't waive their, okay. Thank you, Your Honors. Good morning, Your Honors. My name is Dan Hurley. I represent the United States. Unless the Court would prefer otherwise, I'll start with Mr. Emanetker. It's simply not true that the defense rested before the District Court decided the Rule 29 motion, and Mr. Gilmartin's argument is flatly contradicted by Rule 29. Imagine if the District Court, in deciding the Rule 29 motion, had said, well, when the government rested, it was a pretty close case, and I was leaning towards throwing it out. But now that I've seen Mr. Emanetker testify about the sin of the desert, about one bad guy or two, I don't believe a word he says, and so I'm going to let this go to the jury. We'd be here, and the claim would be that's a clear violation of Rule 29 because the rule says the District Court can only consider the state of the record, the evidence in the record, at the time the motion is reserved. And the time the motion is reserved is the point at which the defense makes the motion at the close of the government's case, and then we move on and we carry on with the trial. Mr. Gilmartin is suggesting that there's some sort of rolling point at which the District Court has to keep considering more evidence, and that's just not the law. It's not the law under Rule 29, and that this court has dozens of cases, frankly, that say if you move for judgment of acquittal at the government's case-in-chief, and you then introduce evidence, you must renew it at the close of the case. And it's particularly the case here because Mr. Gilmartin is wrong that Mr. Amenecker even rested at the time the District Court's decision came out. The defense did not rest until a day later. The District Court does not know when Mr. Amenecker is or is not done with his case. All three defendants continued to participate in the defense, and then there was even a rebuttal case from the government after that. And so this is simply not a case where the record was closed, the District Court had all the information it needed. The District Court's decision was at the close of the government's case-in-chief, was there sufficient evidence to get to the jury? The answer to that is yes, and this court's review can only be for a gross miscarriage of justice or manifest miscarriage of justice based on the record from the government's case-in-chief. So all of the statements in the brief about what Mr. Amenecker testified to, under Rule 29, that's off-limits. And the District Court was prohibited from considering that, and this court is as well. I will admit I don't understand the argument about it's not a security. Wire fraud is wire fraud. Mr. Amenecker was not charged with securities laws violations, he was charged with participating in a scheme to defraud. The jury found that there was sufficient evidence, and as we laid out in our brief, we think there is more than enough evidence to convict him of participating in that scheme to defraud. Particularly, when after he admits he knows that Conan is a liar about everything from start to finish, Huebner knew, and two and a half weeks later, he's on a conference call with Conan saying, welcome back my good friend, how's the hedge fund doing? And he knew, everybody knew on the inside that that was all a lie. There was no hedge fund, there would be no hedge fund, he wasn't a Wall Street mastermind, he wasn't a Gulf War veteran. That's fraud. Start to finish, that's fraud, and that's what Mr. Amenecker did here. And so, to the extent that's the issue that's being raised today, there's more than enough evidence to sustain this conviction, frankly under any standard, but particularly under the Manifest Miscarriage of Justice standard. The First Amendment argument was not raised below, and the government was not prosecuting Mr. Amenecker for the speech, but there is no First Amendment defense to propagating lie after lie after lie, and that's what the evidence showed happened here, and so this prosecution is entirely consistent with First Amendment protections. It's not like a regular media story because they're lie after lie after lie. With respect to... It never happens in the media? I didn't say that, Your Honor. With respect to Mr. Huebner, if the court's agreeable with this, I'll talk about Mr. Huebner next, and the restitution issue, I don't know of any case that says a victim has to step up and say, I claim to be defrauded before restitution can be awarded. If anything, the district court could have just said, it's all a fraud, and so I'm going to award full restitution. Instead, the district court tried to create an offset for some value because these people do have these notes. That's all the statute requires, and I think there's no showing that the numbers are wrong in a fundamental way that would make this unfair. The district court's doing the best it can, as district courts always do when they're trying to estimate future losses. I suppose if they really don't think they're victims, they can give the money back. They can give the money back, they can sell the DNR. Give the money back to the gentleman opposite. Yeah, that's right, Your Honor. We're not saying that if the DNR drops further that the victims can come back. The district court has to come up with an estimate. At some point in time, that's what happened here, and then the parties move on, and we think that's consistent with what the Supreme Court was saying about the value of the collateral in the Robers case. With respect to Mr. Teat, he testified at the preliminary exam in this case, and he specifically was asked directly, you went down there and you filled out those forms falsely. The point of that was to get money to go from Wood County to Huebner's company, and Teat said yes. That's signing on to a scheme to defraud. He's making false statements. He went with Kelly Bland. They both went down together. They brought their ID. They filled out the forms falsely, and they knew that the point of filling out the forms falsely was to get government funds to flow to Huebner's company. That's a scheme to defraud. He doesn't have to say out loud, I'm joining your scheme now. He clearly signed on to participate in that scheme, and it's even worse because long after they submitted the false forms, the evidence shows that there was an email from Teat's email account to the county demanding, where's the money? We haven't paid enough. We want it paid sooner, we want it paid faster. That's participating in a scheme to defraud. The jury's entitled to read it that way. Teat denied sending it, but the jury doesn't have to accept his testimony. Viewed in the light and most favorable of the government, there is more than sufficient evidence to support Teat's mail fraud conviction. Unless the panel has any further questions, we're prepared to rest up. What about the DINARs in the desk? It is, Your Honor, on the forfeiture issue. Claims that these people were defrauding others, but they were also buying DINARs for their own account, and he says, these were just my DINARs, and I paid for them. That's true, Your Honor, and the district court had to make a factual determination, and I will concede there was evidence pointing in each direction. The district court could have credited Teat's testimony. He could have said, I find him credible, and I'm going to give him a credit. I'm going to take away from the Huebner forfeiture. I'm going to find those were Teat's DINAR. But conversely, the district court also could have said, as it did, Mr. Teat says they're his, but his story is full of holes. There's all these inconsistencies about is it safe to store DINAR there? Were they marked? Were they not marked? Were these for an IRA? Did he buy them the previous summer? Mr. Teat submitted some checks to say, well, these are the checks I was using to pay for the DINAR. The standard of review on this kind of factual finding? This is a clearly erroneous standard of review, is my understanding, Your Honor. It's a factual determination. He says they're mine. Other evidence says they're not. The district court looked him in the eye and said, I don't find you believable, and as a result, I'm not going to give you this money, essentially. Mr. Teat's argument has an implicit thread that the government has to decide at the front end of a case whose money or whose property it may be, and if we ever suggest that there's competing claims as there were here, that that property is then foreclosed from forfeiture. I'm not aware of any case that supports that, and I think that's wrong because it's a probable cause standard at the indictment stage. It's preponderance of the evidence for the actual arrest. It's a restitution determination. If this court has any other questions, we're prepared to rest in our briefs. Thank you. Thank you, Your Honor. We have rebuttal times. Thank you, Your Honors. I might address the question we just did. Is clear error the standard here? Yes, Your Honor. The issue, though, is not, we're not making the argument that if the government chooses to indict, criminally indict on a criminal forfeiture and name my client that they're forever foreclosed from arguing anything else with regards to Mr. Huber. That's not what we argued in our brief. What we argued in our brief was that the grand jury identified Mr. Teat as the owner of this $15,000 worth of dinar. They took that matter all the way through trial. They did not dismiss the criminal forfeiture count at any time. I couldn't find anywhere in the record where it's ever been dismissed, but yet, after trial, filed a civil forfeiture action against Huber alone to shift the burden of proof in this matter. And that's our argument is that the burden of proof was on the government to prove that it wasn't Teat proper, that it wasn't his proper money, if it was a criminal forfeiture. Instead, they filed a civil forfeiture after trial against Huber, and then flipped it to where saying that now it's Teat that needs to prove that it was his money and not Mr. Huber's, and we're not putting on any evidence with regards to that. We're only going to say, look at the trial, your honor, and allowed Mr. Teat then to testify at that hearing. That's the major problem with this issue. And if you take a look at the facts. They're saying there's a legal barrier or principle that you can't go for civil commitment, civil forfeiture if you've previously tried criminal forfeiture? No, but you have to bring the criminal forfeiture to a conclusion. It's just like if there was a money laundering count that got hung up by the jury that we're now up on appeal and it's still hanging out there. It was never dismissed. It was never retried. It was just, it's just, nothing's happening. Are you saying that one morphed into the other one or they were just, the court just shifted from one to the other? After the trial, while the criminal forfeiture is still pending because the parties agreed that they would handle the criminal forfeiture after the trial, the government filed a civil forfeiture against Mr. Huber alone and included in the $15,000 that they had claimed in the indictment was Teat's money. But suppose they, I mean, you're saying, oh, they never dismissed the criminal forfeiture. Suppose they had. Why are you any better off? Well, if they had, then we may have a different argument, but they didn't. But even then, the great preponderance of the evidence suggests that it's Mr. Teat's money. Okay, but that gets us back to the third argument. Yes. Unless there are any further questions. Thank you, Your Honor. Based on the government's argument, I would waive my reply. I think the positions of the parties are clear. All right, thank you. Mr. Gilmartin. Thank you, Your Honor. I would like to open my reply by saying, which I offer an apology to Mr. Dan Hurley. I did misspeak what happened with the rule to dismiss. What happened was the defense did not rest. They just, my person didn't put on any more evidence. So they made a Rule 29 at the close of the government's case. And the judge decided not to rule on it. He said, I'll think about it. Once Mr. Emenecker's attorneys put on all the evidence for Mr. Emenecker, they stopped. Some more witnesses were called by the other defendants. They didn't cross-examine those defendants, and they did not introduce any more evidence after they stopped putting on their defense. But as a procedural matter, would they have been able to? In other words, you put on a bunch of evidence and you stopped. Other people put on evidence, but it's still the defendant's side.  oh, by the way, I want to go back to the case? I want to introduce some more witnesses. I have to admit that I think defense attorneys should have a checklist, and when they're done, they mark off or make a Rule 29. I admit that. They should. There are a lot of things people should do. Yeah, but my client should not be held to have waived his motion. To get back. It's not what the rule says, right? Didn't the rule say something different? Your Honor, to be honest, I can't recite the rule verbatim. Well, I can't either. I was just asking in case that hopes that you could. I rest on the case of Calderon by the United States Supreme Court in the Sixth Circuit case of, I think it's Wagner. If I may address the First Amendment allegations that the First Amendment doesn't protect fraud, the two cases that the prosecutor cites in his brief, page 23, right at the top, it starts on 24, is U.S. v. Jeffries. He said, noting the First Amendment does not disable the government for prosecuting crimes such as fraud, even though they intrinsically constitute speech. Well, this is about some domestic relation case that blew up, and the defendant composed a rock and roll song, and part of the rock and roll song is I'm gonna kill the judge. And then the next case, United States v. Stevens, he was arrested for depicting scenes of animal cruelty, which is against federal law. I agree with that law, but his conviction was reversed. By no stretch of the imagination, what Mr. Eminecker said rises to things that occurred in these other cases. Once again, I did say, Judge Hood mentioned about oil wells. If you want someone to invest in an oil well, you have to do prospectuses, comply with state law, offerings for securities. Once again, federal law says that DNR's currencies are not covered by the investment law, even though appreciation's the motive. And the case which we rely upon out of the Second Circuit is Regents Office Supply, because this would criminalize things. If I wanted to sell my car, and I said, you know, this was old, before me a little old lady bought it, drove it, took really good care of it, and I sell it, as long as I didn't roll back the odometer or say it was a six-cylinder car and it was a four-cylinder car, none of this is illegal, because what Eminecker did is he, it's okay to lie to be able to present an offer of sale to somebody. Where it becomes criminal is if I agree I will sell you 100,000 DNR's for $100, and you give me the $100, and I give you counterfeit DNR's, or I only give 50,000, where I chintz on the deal, that's the crime, and it didn't happen here. It's okay to lie in order to sell property, let's say, as long as you actually deliver that property, is that the proposition? What, it's okay to lie to be able to present, to get someone to sit down so you can present the offer. They sold the DNR's, what happened is these were predictions, constantly people say, buy gold, I've talked about this before, and they don't come true. There's a whole set of law about predictions and puffing, and there's a whole set of law about when you've crossed the line to actual lying, not just predicting and puffing, and that's what the jury found. Well the jury was mistaken, and the prosecutor, and the government was mistaken, because, I'm sorry, I didn't mean to talk over you, your honor. I was just saying, were the instructions erroneous, or are you saying that the instructions were fine, it's just the evidence was completely insufficient? The indictment was wrong, except for when it came to the trust, I mean the hedge funds, and we go on to say, the hedge funds saying there were hedge funds in selling the seats, no question that was illegal, but Mr. Emenecker, if you want to characterize it as participation, he did nothing illegal, and with that, I see my time is up. Do you gentlemen have any, ma'am, do you have any other questions? Thank you. Case will be submitted, and the clerk may adjourn court.